UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| NATHAN EPPLE,<br><br>           Plaintiff,<br><br>    v.<br><br>JOHN PLASSE Sheriff,<br><br>           Defendant. | No. 2:20-cv-00692-JMS-MJD |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[1] All aspects of public life in the United States were affected, including the operations of correctional facilities.

Nathan Epple has been a pretrial detainee in the Vigo County Jail since October 2019. In late November 2020, he became sick with symptoms of COVID-19. In December 2020, jail officers asked Mr. Epple to assist with moving his sick cellmate Frederick Whitlock, who urinated and vomited in the process. Mr. Whitlock was then transported to the hospital where he died. Mr. Epple's request for a change of clothes after the incident was denied. After his death, Mr. Whitlock tested positive for COVID-19, which led to the discovery that over 100 inmates at the Vigo County Jail were positive for the virus, including Mr. Epple.

Based on these allegations, Mr. Epple has sued Vigo County Sheriff John Plasse for violating his Fourteenth Amendment rights. Sheriff Plasse has filed a motion for summary

---

[1] *See* Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 13, 2022).

judgment. Dkt. 44. For the reasons below, that motion is **granted** as to Sheriff Plasse in his individual capacity but **denied** as to claims against him in his official capacity.

## I.
## Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572−73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because the defendant has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A.  COVID-19 Policies at the Vigo County Jail

Charles Funk has been the jail commander at the Vigo County Jail since 2013. Dkt. 41-2 at 7. According to Mr. Funk, the jail never had any written policies regarding COVID-19 because guidance on best practices "was changing so much." *Id.* at 12. If he had questions about CDC or Indiana State Department of Health guidelines, he would call someone at the local health department. *Id.* at 12−13. Thus, whenever the guidelines changed, staff would learn about the changes at staff meetings or by email. *Id.* at 14, 47 ("I – occasionally we would get an email, but I don't know that there was – there was nothing like if it changed today, I got notified[.]"). Mr. Funk also testified that he was not sure if inmates were educated about how to recognize symptoms of COVID-19. *Id.* at 47.

Beginning in March 2020, inmates who were booked into the jail were quarantined for two weeks before being transferred to general population. *Id.* at 49−50. Masks were provided to inmates to attend court hearings beginning in June 2020. *Id.* at 50. Jail staff began wearing masks in August 2020. *Id.* Inmates were required to wear masks beginning in December 2020, after the COVID-19 outbreak identified after Mr. Whitlock's death. *Id.* at 51. Jail staff were told not come to work if they were experiencing COVID-19 symptoms or were in close contact with an individual

who tested positive. Dkt. 41-2 at 11.

Inmates were provided with cleaning supplies each day. Dkt. 41-1 at 65. The cleaning supplies included a mop, a mop bucket with a disinfectant cleaning solution, and a spray bottle with a disinfectant. Dkt. 41-2 at 54−55. Jail officers sprayed common areas with a bleach solution, *id.* at 55, but inmates were not allowed access to the bleach, dkt. 41-1 at 40. Additional cleaning and disinfecting measures—including a "fogging machine"—were implemented after the December 2020 COVID-19 outbreak. *Id.* at 56.

The Court takes judicial notice of the proceedings in *Huerta v. Plasse*, 2:16-cv-00397-JMS-MJD, in which this Court granted summary judgment in favor of a class of incarcerated individuals at the Vigo County Jail based on unconstitutional conditions of confinement at the jail due to chronic overcrowding and other conditions. *See Huerta*, dkt. 146. A new jail has been constructed and opened, but, at all times relevant to this action, the inmates were housed in the old jail. In order for the jail to maintain remain below capacity, it was required to not exceed 268 inmates, *id.* at 16, and a November 2020 report indicated that on November 26, 2020, there were 280 inmates, dkt. 284 at 2. In short, in November and December 2020, the Vigo County Jail continued to be overcrowded, a point the Sheriff does not dispute. Dkt. 45 at 9. There is no evidence in the record concerning any efforts by the Sheriff's Department to increase social distancing within the jail during the height of the pandemic.

The jail contracts with Quality Correctional Care ("QCC") to provide medical care to the inmates. Dkt. 41-2 at 23. QCC charged inmates $15 to see a nurse via a request on the kiosk, and another $15 for prescription medication. Dkt. 41-1 at 18, 51. There is no evidence that QCC modified its policies related to co-pays for treatment in light of the COVID-19 pandemic.

There are material disputes as to when COVID-19 tests were first available in the jail.

4

Mr. Funk testified that it was around early December 2020 when the jail first received tests, dkt. 41-2 at 20, but status reports that were provided to this Court in the *Huerta* case indicated that inmates were being tested upon their admission to the jail as early as August 2020, *see Huerta*, 2:16-cv-00397, dkt. 278 at 2.

### B. Mr. Epple's Symptoms and December 4, 2020, Incident

Mr. Epple began to feel sick around November 26, 2020.[2] Dkt. 41-1 at 16. He had lost his sense of taste and smell, his chest and back hurt, and he had trouble breathing. *Id.* Mr. Epple testified that other inmates on his block felt sick at the same time. *Id.* at 17. Generally, when an inmate is sick he submits a request to be seen by medical on a kiosk. Dkt. 41-2 at 26−27. Mr. Epple did not submit a healthcare request on the kiosk because by doing so, he would be charged $15 to be seen by the nurse. *Id.* at 18−19, 51. Mr. Epple testified that because everyone on his range felt sick, no one submitted a medical request on the kiosk but rather they informed the officers of the situation. Dkt. 41-1 at 17. A correctional officer got a thermometer from the nurse's station, took the inmates' temperatures, and told them that they were fine. *Id.* Mr. Epple asked an officer for a COVID test, but the officer told him that he was fine and did not have COVID-19. *Id.* at 19. At that point, Mr. Epple was unaware of any inmate being administered a COVID test. *Id.*

Mr. Epple and Mr. Whitlock had been cellmates for three or four months and would work out together. *Id.* at 14, 37. Mr. Whitlock became ill around the same time as Mr. Epple, and they stopped working out. *Id.* at 38. Three days before his death, Mr. Whitlock told Mr. Epple, "Youngster, I did all this working out, and I think it will be all for nothing. . . . This COVID is going to kill me." *Id.* at 37.

---

[2] Mr. Epple testified he began to feel sick around Thanksgiving. The Court takes judicial notice that Thanksgiving occurred on November 26 that year.

On the morning of December 4, Mr. Whitlock retrieved his breakfast tray before returning to his cell. *Id.* at 14. Upon his return, Mr. Epple heard Mr. Whitlock's breakfast tray smack the table, and Mr. Whitlock fell onto Mr. Epple. *Id.* Mr. Epple said Mr. Whitlock's name and realized something was wrong when Mr. Whitlock did not respond and began to suffer an apparent seizure. *Id.* at 21. Mr. Epple put Mr. Whitlock on his side and another inmate summoned help. *Id.*

A guard looked into their cell and ordered the inmates on the range to lock down. *Id.* at 21. Mr. Epple went to a nearby cell. *Id.* Officer Suter and Officer Switzer responded to the situation and alerted medical staff. Dkt. 41-4 at ¶¶ 4, 6−8. A nurse came to the cell and determined that Mr. Whitlock needed to be transported to the hospital because his oxygen levels were low. *Id.* at ¶¶ 9−10. Officer Suter and Officer Switzer were unable to get Mr. Whitlock into a wheelchair because Mr. Whitlock was dizzy and unable to assist. *Id.* at ¶ 11.

Officer Switzer walked to the cell where Mr. Epple and another inmate, Floyd Cheesman, were locked down. Dkt. 41-1 at 24. Officer Switzer told the inmates that they needed to get Mr. Whitlock into the wheelchair. *Id.* Mr. Epple asked for gloves but was not given any. *Id.* at 59. He didn't ask for a mask because inmates were not allowed to have masks at that time. *Id.*

Mr. Cheesman and Mr. Epple went to Mr. Whitlock's cell and began to move him. *Id.* at 27. As they were lifting him onto the chair, Mr. Whitlock urinated and started vomiting. *Id.* Mr. Whitlock began having another seizure, so Mr. Epple picked him up from the wheelchair and placed him on the floor outside of his cell. *Id.* at 27−28. Officer Suter applied a sternal rub as Mr. Whitlock drifted in and out of consciousness. Dkt. 41-4 at ¶ 16. Emergency medical technicians arrived and took Mr. Whitlock to the hospital. Dkt. 41-3 at ¶ 25. Mr. Whitlock died at the hospital, and a test revealed he was COVID-19 positive. Dkt. 41-2 at 69.

Back in the jail, Officer Suter provided Mr. Cheesman and Mr. Epple some cleaning supplies and ordered them to clean Mr. Whitlock's cell and the range outside his cell. Dkt. 54-1 at 40−41. Suspecting that Mr. Whitlock had COVID-19, Mr. Epple asked for bleach so that he could thoroughly clean their shared cell, but he was denied it. Dkt. 41-1 at 37. After finishing, Mr. Epple asked nearby officers if he could receive a change of clothes because he had Mr. Whitlock's bodily fluids on him, but the officers ignored his request. *Id.* at 37−39. In general, inmate uniforms are exchanged once a week on Saturday. *Id.* at 45. The incident occurred on a Friday, so Mr. Epple believes he received new clothes the next day. *Id.*

The jail nurses administered rapid COVID-19 tests on the inmates who were in Mr. Whitlock's block. *Id.* at 42. Five inmates tested positive, and they were all sent back to their block with the inmates whose tests were negative. *Id.*

A couple days later, the Indiana Department of Health Strike Force tested all inmates at the jail for COVID-19 in light of Mr. Whitlock's passing. Dkt. 41-2 at 59. Over 100 inmates tested positive, including Mr. Epple. *Id.*; dkt. 41-1 at 43. Inmates who tested positive were placed in separate cellblocks and quarantined for two weeks. Dkt. 41-1 at 43. The sick inmates were provided Tylenol twice a day for five days. *Id.* at 44. The jail was locked down and recreation was suspended. Dkt. 41-2 at 52. Inmates were provided masks after this outbreak. *Id.* at 59.

Inmates and staff were offered vaccines once they were available in 2021. Dkt. 41-2 at 57. Mr. Epple refused the vaccine three times because he was unable to research its safety. Dkt. 41-1 at 51−52.

Mr. Epple testified that he is suing the Sheriff because he believes jail staff intentionally placed him in danger of contracting COVID-19 by compelling him to assist Mr. Whitlock without any training or protective gear such as a mask and gloves, and because the jail was not taking

7

COVID-19 seriously when it failed to provide any COVID testing or masks before Mr. Whitlock's death. *Id.* at 48−51. Mr. Epple suffers from emotional distress wondering if there was more he could have done to help Mr. Whitlock. *Id.* at 53.

### III.
### Discussion

Mr. Epple argues that the actions taken by the Vigo County Sheriff's Department in November and December 2020 were deliberately indifferent to his risk of contracting COVID-19. Sheriff Plasse argues that he is entitled to summary judgment because (1) he was not personally involved in protecting Mr. Epple from COVID-19, and (2) the Sheriff's Department did not have a policy, custom, or practice of violating Mr. Epple's Fourteenth Amendment rights.

#### A. Individual Liability

"Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). "[S]upervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018); *see also Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002) ("Under § 1983, there is no respondeat superior liability.").

There is no evidence that Sheriff Plasse had any personal involvement in the events that took place in November and December 2020. He was not present when Mr. Whitlock became ill, and there is no indication he was involved with COVID-19 testing, jail masking requirements, or failing to provide Mr. Epple with gloves or clean clothes. Accordingly, summary judgment is **granted** as to Sheriff Plasse in his individual capacity.

#### B. Practice-or-Policy Claim

The Court now turns to whether Sheriff Plasse is entitled to summary judgment in his

8

official capacity. *See Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("Indiana Code § 36-2-13-5(a) provides without further qualification that it is the sheriff's duty to take care of the jail and its prisoners. Thus, . . . the sheriff serves as the county's official decision-maker in matters involving the county jail.").

In order to maintain a § 1983 claim against Sheriff Plasse in his official capacity, Mr. Epple must show that his constitutional rights were violated by a policy or custom of the Sheriff's Department. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Mr. Epple must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Sheriff's Department custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Further, to the extent that he is challenging a facially lawful policy (express or implied), he must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If he is challenging an unconstitutional municipal practice or custom, he must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

      i.      **Deprivation of a Constitutional Right**

Generally, conditions-of-confinement claims for pretrial detainees, which are derived from the Due Process Clause of the Fourteenth Amendment, are analyzed under an objective standard. *Hardeman v. Curran*, 933 F.3d 816, 821−22 (7th Cir. 2019). Under this standard, the plaintiff must show that the conditions (1) pose an objectively serious threat to his health or safety, and (2) that the defendants' response is "objectively unreasonable" given the totality of the circumstances. *Id.*

However, *Monell* liability only attaches when the plaintiff shows that the municipality acted with deliberate indifference. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020). As the Supreme Court has explained,

> [Q]uite apart from the state of mind required to establish the underlying constitutional violation . . . a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.

*Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407 (1997); *see also Miranda v. County of Lake*, 900 F.3d 335, 345, 352 (7th Cir. 2018) (applying deliberate indifference standard to pretrial detainee's *Monell* claim despite disavowing that standard for pretrial detainee's claims against individual defendants).

Thus, the Court analyzes Mr. Epple's claim under the deliberate indifference standard. Under that standard, Mr. Epple must show that he was at serious risk of exposure to harm, and the Sheriff "kn[ew] of a substantial risk of harm to an inmate and either act[ed] or fail[ed] to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). The fact that Mr. Epple contracted COVID-19 is not enough to show deliberate indifference because the sheriff can avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

There is no dispute that the COVID-19 virus created a serious risk of harm to detainees' health, and that the general risk of exposure is exacerbated by the close quarters that detainees are subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

10

Thus, the Court must determine whether there is a dispute of fact as to whether the Sheriff's policies related to COVID-19—or lack thereof—evinced deliberate indifference. The Court concludes there is.

First, a jury could find that Sheriff Plasse was deliberately indifferent by failing to create a comprehensive written policy to combat the spread of COVID-19 in the jail. In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017), the Seventh Circuit concluded that a medical services provider could be liable for failing to establish a protocol for the coordinated care of chronic illnesses because the need for such a protocol was "obvious," so a jury could find that the lack of protocol caused the plaintiff's death. While the Court recognizes that the evolving nature of the COVID-19 virus and guidance provided by the CDC would warrant a flexible approach, a jury could find that the lack of a written policy resulted in a haphazard response in the jail. For example, there was no obvious coordination between the jail and QCC on educating inmates about the virus, procuring tests, or waiving copayments if an inmate had a concern related to COVID-19. Mr. Funk's testimony that staff was informed of guideline changes sometimes at staff meetings and sometimes by email does not inspire confidence that all Vigo County Jail staff members were on the same page at any given time.

To the extent that the Sheriff's Department had a policy to combat COVID-19, a jury could conclude that the few steps taken were so ineffectual as to evince deliberate indifference. In an overcrowded facility, no efforts were made to socially distance inmates.[3] There was no evidence that inmates were provided educational materials about COVID-19. Sheriff Plasse does not explain

---

[3] The Court recognizes that deference must be afforded to jail administrators in matters implicating safety and security concerns, including decisions related to inmate housing. *Mays v. Dart*, 974 F.3d 810, 820, 824 (7th Cir. 2020) (vacating portion of preliminary injunction that precluded Cook County Sheriff from double-celling inmates during COVID-19 because housing decisions implicated security concerns while upholding provisions regarding masks, sanitation, and testing). Here, though, the Sheriff provided no evidence related to social distancing efforts.

why jail staff members were not required to wear masks until August 2020, or why inmates were not *allowed* to wear masks before December 2020. There was no evidence that staff members were screened for symptoms upon entry into the jail. A jury could find that the few policies enacted—increased cleaning, quarantining incoming inmates, and bleaching common areas—were insufficient in light of the serious risks posed by COVID-19 and other reasonable measures that could have been taken. *See Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (upholding grant of preliminary injunction where officials at immigration detention center failed to provide detainees masks or compel guards to wear masks, failed to enact social distancing measures, and failed to provide sufficient soap or hand sanitizer).

Many courts have granted summary judgment in favor of municipalities for their responses to the COVID-19 pandemic, but the jail officials in those cases enacted far more comprehensive policies than those presented here. *See e.g. Harb v. Penzone*, Case No. CV-21-01032-PHX-MTL, 2022 WL 17177675, *12 (D. Ariz. Nov. 23, 2022) (Maricopa County Sheriff not deliberately indifferent where in March 2020 jail enacted policies that restricted visitors, reduced inmate populations, distributed masks and cleaning supplies to inmates, required staff and inmates to wear masks, instituted screening protocols for everyone entering the jail, etc.); *Brogan v. BRRJA*, Case No. 7:21-cv-00180, 2022 WL 875040, *5 (W.D. Va. Mar. 23, 2022) (similar provisions including masks, temperature checks, and testing); *Carpenter v. Thurston County*, Case No. 3:21-cv-05859-BJR-JRC, 2022 WL 3239754, *5 (W.D. Wash. June 13, 2022) (similar provisions including screenings, quarantines, face mask directives, social distancing, and enhanced cleaning). In this case, however, there are material disputes of fact as to whether the Sheriff was deliberately indifferent to the serious risks of harm given the minimal safety measures he undertook.

Further, Mr. Epple has produced evidence that multiple inmates were injured by the Sheriff's policies. *Helbachs Café LLC*, 46 F.4th at 530. Mr. Whitlock tragically died, and over 100 inmates tested positive for COVID-19 shortly after his death.

Because there are material disputes of fact as to whether the Vigo County Sheriff's Department COVID-19 policies caused Mr. Epple to suffer a constitutional injury, summary judgment must be **denied** as to the official capacity claim against him.

## IV.
## Conclusion

For the foregoing reasons, the Sheriff Plasse's motion for summary judgment, dkt. [44], is **granted** as to Mr. Epple's claims against him in his individual capacity and **denied** as to claims against him in his official capacity.

The magistrate judge is asked to hold a settlement conference.

**IT IS SO ORDERED.**

Date: 2/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com

William Russell Morris, Jr.
LAW OFFICE OF WILLIAM R. MORRIS, JR.
wimorris.attorney@gmail.com

Magistrate Judge Mark Dinsmore